The case argument this morning is 20-1194 Emergency Planning Management v. United States. Mr. Delisle, whenever you're ready. Thank you, Your Honor. May it please the Court, Edward Delisle v. Kerman on behalf of the Appellant Emergency Planning Management, Incorporated. Your Honor, this case involves an issue that the Federal Circuit has not specifically addressed in the past. Mr. Delisle, we have this 2019 Appropriations Act, and I wasn't clear from your brief whether you agree or disagree that the Act compelled the agency to bundle these two things in a single procurement. Do you agree with that, or do you disagree with that? Your Honor, I disagree that the Appropriations Act of 2019 specifically requires the Department to bundle these activities. I do believe that that's what it felt it required, but I do not believe that it specifically states such. In fact, Your Honor, on that specific point, the appropriation language itself speaks to certain limited exceptions within it, which opens up the possibility of other potential contracting opportunities as part of this particular program or solicitation. So I would suggest that simply by the nature of the verbiage in the Appropriations Act itself, it contradicts the basis that it must be bundled. I do understand that that's the position, however, that the government has taken, that the Department has taken. Okay, but you didn't really argue this in your brief. Are you saying that the certain limited exceptions language in the Appropriations Act means that it's not a universal requirement? Is that what you're arguing? That's certainly true, Your Honor. And the reason why we argued this in the manner that we did, we understand that the agency has a certain amount of discretion with respect to how it is to interpret a directive such as this, and that's understood. But despite that discretion, it is our position that there was nothing in that appropriations of language which could be discerned as allowing the Department to avoid going through and following through with the mandatory requirements of Part 7. Well, I don't understand that. I mean, if there are procedural requirements here, and they weren't followed, and the government seems to agree that some of them weren't followed, it's certainly harmless error if they were compelled by the Appropriations Act to bundle. We disagree with that position, Your Honor. Really? Why? Well, the reason that we differ with that position, there are a couple of different bases. The first is as part of the mandatory, what we consider to be mandatory bundling requirements of Part 7, there is the need during acquisition planning for the agency to coordinate with the Small Business Administration. And as part of that process, to discuss alternatives and to maximize the ability for small business to participate. And that is extremely or was extremely important in this particular instance. It never happened, and I think the government will admit that it didn't happen at the acquisition planning stage. But it was extremely important because had it occurred the way that it should have under FAR Part 7, alternative strategies could have been identified that would have allowed companies like the appellant to participate on a limited basis, which is consistent with the appropriations language, to participate as a prime contractor to the department. I don't understand. I simply do not understand what you're saying. If this statute required bundling, how does any procedural defect change the result? Because the agency wouldn't have a choice no matter what information it secured as a result of procedural compliance. Gerard, I can give you an example if it helps. If the mandatory requirements of FAR Part 7 were followed, an alternative strategy could have been employed such as, for example, instead of using the contracting method that was actually used here, they could have used a GSA schedule vehicle as the means by which this occurred. And if they did it that way, you could bundle these procedures, yet based upon the manner in which the GSA schedule contracts are used, there was a possibility had they gone down that route. I don't understand a word of what you said. If, in fact, this statute requires bundling, how could the agency not bundle? As I indicated earlier, Your Honor, the actual language indicates that there are certain limited exceptions that would permit the use of contractors other than through this bundled understanding that the agency claims that it had as part of reading the language once it was issued. So, in other words, your sole reliance, your sole theory is that the statute doesn't require bundling because it allows for exceptions, and if they followed the procedure, they might have allowed an exception here. Is that your point? They could have done that in precisely this instance, Your Honor. This is Judge Hughes. Can I just confirm? Let's just put apart this exception stuff because I don't know that you clearly argued it, but even if you did, let's just set it apart. Let's assume, I think, the statute definitively required bundling and that DOE followed that statutory mandate and bundled. Could your client have competed for fully bundled services? It could not have competed for a fully bundled service unless it was part of a team, Your Honor. They couldn't have competed as a prime, which is what you're arguing about. You still had the opportunity to try to get some work on this stuff, right? So, the only way you get to harm is if the agency's reading requiring this contract to be bundled is legal error. Is that correct? Correct, Your Honor. Okay. Thank you. Sure. May I continue? Yes, please. Yes, thank you. So, what we have here is a case that the Federal Circuit has not previously dealt with, which is, are the requirements of FAR Subpart 7.107-3 through 5 and those portions of the Small Business Act, they're applicable to it, mandatory? And if they are, whether the agency's failure or an agency's failure to follow those procedures, do they constitute conduct that is without observance of procedure required by law in violation of the Administrative Procedure Act? I mean, of course, we feel that the provisions of FAR Part 7 Subpart 107-3 through 5 are mandatory. They weren't followed. And because they were not followed, they violated the APA and that the Court of Federal Claims erred in finding otherwise. FAR 7.107-3 through 5, which did not go into effect until October of 2016, set forth procedures that an agency must go through if a procurement action either could or will result in bundling or substantial bundling. With respect to bundling under FAR 7.107-3, it indicates that before conducting an acquisition strategy that involves bundling, the agency shall make a written determination that bundling is necessary and justified in accordance with 15 U.S.C. 644-E, which is a portion of the Small Business Act. Necessary and justified is determined when an agency establishes that it would obtain measurable substantial benefits by bundling discrete independent requirements. The agency, in that regard, must conduct market research to quantify and eventually conclude that it would obtain these measurable substantial benefits. In terms of the quantification of those benefits, FAR 7.107-3 is very specific in terms of what constitutes measurably substantial. It's when individually, in combination, or in the aggregate, the anticipated financial benefits are equivalent to 10% of estimated contract or order value, if the value is $94 million or less, or 5% of estimated contract order value, or $9.4 million, whichever is greater, if the value exceeds $94 million. That's a very specific cost analysis. Why? Because the provision along with the substantial bundling provisions of FAR Part 7 and the notice provisions take into account that bundling will very likely hurt small business, especially when it relates to becoming a prime contractor. So there needs to be some financial means by which to measure the substantial benefits, and it has to be rooted in data. Mr. Delisle, I want to bring you back for a moment to this language in the statute, with certain limited exceptions. Yes. Are you familiar with the committee reports that accompany this legislation? I believe so. Okay. In page 199 of the Senate report, it talks about these limited exceptions. It says that they don't want them to stop contracts which are already in existence and another similar exception for existing contracts. So when we're trying to read the legislation talking about limited exceptions, why wouldn't we read the limited exceptions in the light of the committee reports to refer to these continuing contracts? I think the way to read the appropriations language, Your Honor, is to read it in complete context. It does say, with certain limited exceptions for sure, and I understand Your Honor's point with respect to the Senate report, but there isn't anything specifically in here which indicates that bundling is a necessity. I understand the discretion with which the government is afforded when it comes to reacting to what it considers to be a directive such as this, but when looking at this in context, there isn't anything in here which indicates that it has to happen. Your basic argument, as I understand it, is that the agency could have read this language with certain limited exceptions to allow exceptions for situations where allowing separation would promote small business. Correct. And I think what you need to do, Your Honor, is you need to balance very quickly what we see here with the Small Business Act of 2010, which is where these FAR provisions emanate from. I believe I'm out of time, or am I not? Okay, why don't we hear from the government? I think I did hear your bell. Yes. Thank you, Your Honor. But you will be paying your rebuttal time. Thank you. Yes, sir.  Thank you, Your Honor. Good morning. May it please the Court. I'd like to start with where... Is the government's position that the statute compels bundling? Your Honor, our position is that the statute compels what Ed did, and I'm not trying to be cute or evasive there, but as the record shows, the agency didn't think it was bundling because the type of change, and that's one thing that didn't come through in Mr. Delisle's argument, the type of change commanded by the statute is complete. Going to a lifecycle approach to servicing student loans required a complete reinvention of how student loan work is done in this country. Before that, it had been a very siloed approach. You can see that in the administrative record, which has the market research that sets the current way or the old way of doing things with where things are going. And once you move to this sort of flatter landscape of servicing where students aren't going to be bounced around from, you know, you take out your loan and then some time goes by and they get assigned to somebody to process the payments. Then they go into delinquency and they move somewhere else. If the default happens, they may bounce over then to a debt collector, like, you know, EPM works as a subcontractor now. I'm not understanding what you're saying. It's a simple question. Does the statute compel bundling or doesn't it? Again, it compels a complete change that results in what NextGen is. If that's viewed as bundling, then it does compel it. Again, the agency's position is it's not bundling because you're not just combining services into one contract. You're completely reinventing the entire business and structuring it in a different way. Mr. Polky, can I just interrupt? Mr. Polky, this is to choose. I don't want to get caught up in terminology here. I think what at least I'm talking about is does the statute require a change in the way these contracts are awarded so that one provider provides the full life cycle of the loan from beginning all the way through the end, including debt collection? Whether we call that bundling or whatever DOE wants to call it, is that the government's view of what the statute requires? Yes, Your Honor. I mean, are we just getting caught up in terminology or is the government's argument here because bundling has FAR requirements that you don't think apply? Well, we made the argument below that a lot of education is not... Let me just... Go ahead. Sorry, let me just put into context why I asked you that question because if the statute requires, whether you call it bundling or consolidation or whatever, or just use the words of the statute, which is a server has to provide the full life cycle of a loan and that's the government's position that that's legally required and there's no discretion there, then it seems to me that your argument then and what was resolved in this case is the protester can't do that. The protester, I think, conceded that it can't do the full life cycle from beginning all the way through the end, including debt collection. So getting caught up in the terminology of whether it's bundling or consolidation doesn't seem to me useful as long as what we're talking about is some kind of view of harmless error that the statute requires this kind of activity, that's what the solicitation required, and even if there are procedural errors from the FAR, there's no harmful error here because this protester can't provide that. Is that the government's position? Yes, Your Honor, and that's also Judge Wheeler's decision, right, that it proceeds from the act. How about the provision of the statute that they rely on about certain limited exceptions, which suggests maybe that bundling or consolidation or whatever you want to call it is not required in every instance? No, it can't be read that way, Your Honor, and the committee notes you mentioned are important because they point to the types of exceptions that are included, which is about not upsetting current student loan accounts that are out there in current contracts, and applying that language differently results in a contradiction, right, because the statute itself says life cycle, get that whole thing together. The goal of that is when you see with all the other supporting materials and what Congress wanted, the Senate letter and other things, is to avoid disruption, avoid having separate operations, which have caused a lot of the problems that were identified and what brought this about. So having the limited exceptions language, given the committee comments, but also just given why this was put out there, there's evidence of why Congress wanted this change to happen, and it comports with the market research and investigations that Ed had done into the problems of student loan collection. Carving out debt collection for debt collectors goes against the entire purpose of what was going on here. Most of the problems were identified in the debt collection area of loan servicing. When you look at the administrative record and the problems that have been identified and that needed to be addressed, a lot of it lives within the debt collection, the default portion of the life cycle of the loan. So carving out that doesn't make sense. So perhaps we're in a Chevron situation where maybe the statute's ambiguous at Step 1 of Chevron, and if we then go to Step 2, where has the agency told us what its construction of the statute is? Well, I think if you're going to go to that analysis, the agency, in its decision to cancel the prior solicitation, speaks about the 2019 Appropriations Act. My question is, what did the agency say about the Act? Did the Education Department say the Act compels us to do this? That it compels a life cycle approach to loans, which is what NextGen is. Did it say that? Yes, I believe that's in the cancellation memo is where it discusses the 2019 Appropriations Act. Could you show us where it said that it views the statute as compelling this? Let me find that language, Your Honor. Hang on. Okay. So the Supplemental Appendix 7, there's a section in the cancellation memo, the preceding solicitation, that discusses the header as funding for NextGen FSA. And here it talks about the Appropriations Act specifically referencing NextGen and a number of provisos, including one requiring the department award no funding for any solicitation for a new federal student loan service environment, including a NextGen processing and servicing money unless the environment provides for the full life cycle of loans to pay off with certain limited exceptions. Yeah, but what it says is Congress was aware of this and envisioned, and envisioned, which is a little different than compelled. Again, I think that it's clear that the agency was mindful of the statutory language from Congress, took it into account, as well as other communications from Congress, took it into account in the development of this. Notes here in the memo that the development of this program, which was aimed at life cycle, was in process before this, and Congress was likely aware of it. And so I think that its interpretation of the language is a fair interpretation. Yeah, but where does it say compelled? Envisioned is not compelled. The language there does not say compelled, Your Honor. It says envisioned. But I think that – I still think that given the language in the act, given the supporting material – Sorry, Mr. Polky, this is Judge Hughes. I would assume you would read the rest of the sentence that says envisioned the use of appropriate funds provided the department comply with the provisos. I mean, that's not compelled, but – Yes, Your Honor. And I think that, you know, as was found in the decision below, it's clear based on this that it was rational. It's clear it's necessary and justified. Now, the compel – Rational is not enough. It could be rational for them to do this, but that wouldn't necessarily excuse compliance with the procedural requirements. On the other hand, if the statute compelled them to do this, the procedural requirements seem to be irrelevant and we seem to be in a harmless error situation. Well, I also think, Your Honor, that it's important to note that the situation here, in terms of the nature of the error, is we are in a situation where a party did not raise prejudice at all in the first instance, raised it for the first time on reply, offers no compelling argument for what exactly the harm is, the prejudice, which is a requirement in a bid protest. So I do think that even moving – if one move says it's not necessarily compelled, the fact that it's rational and that there's no prejudice here, I think brings to the same result, and that's the result that Judge Wheeler reached. And, Mr. Policky, this is Judge Hughes again. Even if we don't find what you're pointing to is sufficient to get the agency Chevron deference, we're still in the world where we have to interpret as a court de novo the view of this statute, right, whether it requires it or not. Yes, Your Honor. Without any deference to education. Well, assuming we, you know, don't agree that this is sufficient for deference, you don't have anything else to suggest that there's something we should defer to. I'm not trying to trap you. I'm just trying to get analytically if this document isn't sufficient, if we find the statute ambiguous, we don't find this document sufficient statement to get Chevron deference, then isn't our job to determine what the statute means even if it's somewhat ambiguous? Yes, it is. And as I argued before. And your argument is that the better reading, even if it's ambiguous, is the government's reading, which is you had to do this. And those limited exceptions were the ones noted in the Senate report and weren't an open door for the education department not to do this kind of bundling or consolidation or whatever you want to call it. Exactly, Your Honor. And as I mentioned in my argument, I think as soon as Your Honors take a step back after argument and maybe look at this specific question, it would make no sense to carve out debt collection. It completely confounds the entire program and everything that Congress has said, and that's in the record. There's the statute, but also the communications from Congress on exactly this point. Everything in the buildup of this program, debt collection was identified as one of the specific problems that needed to be addressed and brought into the lifecycle approach, brought into a single servicer handling students so they don't get bounced around. And that, you can't have that if the exception is, oh, we're going to give that to most students, but some of the accounts we're going to subject to the same problem we had before because we're going to give these small business debt collectors some accounts. That makes zero sense under the statute. I honestly don't see how the statute could be interpreted in that way. So as I mentioned, one of the other core problems here is the prejudice problem. Again, it's in Judge Wheeler's opinion. Emergency planning management filed a 40-page brief, and the only mention of prejudice was once faulting Judge Wheeler for doing a prejudice analysis. There's no argument in their opening brief on what their harm is. And discourse jurisprudence is clear. Bringing it up on reply is not appropriate and not something that should be considered. And the harm that they do bring up is entirely speculative and second-order. It's that the Small Business Administration was supposed to be involved in a different way than it was. There can't be any objection to the – or any argument that Small Business Administration was not a part of the process here. And that somehow through a process, maybe EPM winds up with what the 2019 Appropriations Act says they can't get, and that the Small Business Administration doesn't have the power to get them anyway. The provisions we're talking about don't give the Small Business Administration the power to change the solicitation, to force Ed to do something differently. If it's necessary and justified, then it can proceed. It's not illegal. And Judge Wheeler's findings, everything in the record, support that underlying analysis of the procurement. It's necessary and justified the way it exists. And really, EPM is out of time. I'll stop there. Unless there's any further questions, we'd ask the Court to affirm the decision of the Court of Federal Claims. Thank you. Mr. Delisle, you have a couple minutes left on rebuttal. Yes, Your Honor, thank you. Just a few things. First, I think what we've heard and what we've seen, there isn't anything in the record which compels what the government's advocating here and the meaning of the appropriations language that's in the record for the Court to consider. That's number one. Number two, with respect to prejudice, had the process, the procedure that we believe to be mandatory, was followed and SBA had been engaged when it was supposed to have been engaged during the acquisition planning stage and there's no indication at all that that happened, perhaps, and we're sitting here speculating at this point because it never happened. Perhaps an alternative to what ED opted to do could have been discussed and determined, as between the SBA and the agency, which would have allowed EPM to become a prime contractor to the Department of Education under some alternative scheme. The problem is we sit here now and we speculate as to that because the procedure itself, which we believe was mandatory, was not followed. And that's all that I have, Your Honor. Thank you. We thank both sides and the case is submitted. That concludes our proceedings for this morning. Thank you both. The Honorable Court is adjourned until tomorrow morning at 10 a.m.